IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **ALEX GBUR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 07 C 1923** |
| | ) | |
| **v.** | ) | **Magistrate Judge** |
| | ) | **Jeffrey Cole** |
| **CITY OF HARVEY, ILLINOIS, an Illinois municipal** | ) | |
| **corporation, ERIC KELLOGG, individually and in** | ) | |
| **his official capacity as mayor, ANDREW JOSHUA,** | ) | |
| **individually and in his official capacity as chief of** | ) | |
| **police,** | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Alex Gbur, a white male, was a policeman for the south suburban City of Harvey, beginning in 2001. In April 2003, Harvey elected an African-American mayor – the previous mayor had been white – and Mr. Gbur feels it was no coincidence that his career took a turn for the worse around that time. He was disciplined on a number of occasions, and his employment was finally terminated on March 21, 2007. He filed this lawsuit against the City of Harvey, Mayor Eric Kellogg, and the police chief, Andrew Joshua, who is also African-American and was appointed to his position by the mayor shortly after the election.

Under Count I of his second amended complaint, Mr. Gbur charges the defendants with "race discrimination in violation of Title VII." Mr. Gbur alleges that he was suspended without pay and subsequently discharged because he is white, while similarly situated African-American officers

were treated more favorably when they committed similar or more severe misconduct. (*Second Amended Complaint*, ¶¶ 13-21). Mr. Gbur also claims the defendants: terminated white officers from their employment; rehired African-American police officers who had been discharged or resigned in lieu of discharge for disciplinary reasons; demoted white officers and promoted less qualified African-American officers in their place; disciplined white officers more harshly than African-American officers; and permitted a hostile work environment that subjected white officers to racial epithets and unsafe work assignments. (*Second Amended Complaint*, ¶ 21).[1]

Mr. Gbur charges that defendants with "First Amendment violations pursuant to 42 U.S.C. §1983." He says that when he filed a charge of discrimination with the Equal Employment Opportunity Commission in March 2006, he was treated differently and suffered adverse job actions. (*Second Amended Complaint*, ¶¶ 28-29).

He also claims that when he testified regarding his experiences during a Department of Justice investigation into charges of discrimination in Harvey's police department, he suffered retaliation in the form of threats of termination, denial of vacation days, provision of unsafe equipment, and unsafe work assignments. (*Second Amended Complaint*, ¶¶ 30-33).

Mr. Gbur adds that, after he supported a rival candidate for mayor against defendant Eric Kellogg, the incumbent, he suffered retaliation, including: threats of termination, denial of vacation days, provision of unsafe equipment, and unsafe work assignments, termination, and not being invited to union meetings with the mayor. (*Second Amended Complaint*, ¶¶ 34-35). He also claims

---

[1] Mr. Gbur does not suggest he is bringing a class action on behalf of these other white officers, so these additional claims that do not personally involve him must be provided to support his hostile work environment claim, to give context or provide a backdrop to his own charges of racial discrimination or to show intent under Rule 404(b), Federal Rules of Evidence.

to have been shot at in an attempted homicide by a relative of Mayor Kellogg, who was later apprehended by the Illinois State Police. (*Second Amended Complaint*, ¶¶ 36-38). Mr. Gbur states that the mayor and the chief of police are policymakers for the City of Harvey, and that it is a custom and practice of the city to retaliate against those who publicly express opposition to the city regarding matters of public concern.

The defendants have moved for summary judgment. They argue that this court does not have jurisdiction over Mr. Gbur's Title VII and §1983 claims pursuant to the *Rooker-Feldman* doctrine because he challenged his termination in state court proceedings. (*Defendants' Memorandum*, at 3-4). They also argue that, for the same reason, *res judicata* precludes Mr. Gbur's claims of discrimination and retaliation regarding his suspension and subsequent termination, and the investigation into his conduct that precipitated his suspension and termination. (*Defendants' Memorandum*, at 4-8). The defendants also contend that Mr. Gbur failed to exhaust his administration remedies as to his claims that he was subjected to a hostile work environment and the discriminatory rehiring of terminated African-American police officers. (*Defendants' Memorandum*, at 2-3). In addition, they contend that Mr. Gbur cannot show that his termination was discriminatory, (*Defendants' Memorandum*, at 8-14), that Mr. Gbur has no cognizable First Amendment claim, (*Id.*, at 15-18), and that he cannot establish a claim against the city under *Monell*. (*Id.*, at 18).

# I.

## A.
### Summary Judgment

At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. R. Civ. P. 56(c); *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Once the moving party has made a properly supported motion for summary judgment, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)(footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).

## B.

### Local Rule 56.1

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions.  Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008).  Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts.  Local Rule 56.1(a)(3);  *F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627,

633 (7th Cir. 2005) The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009); *Bay Area Business Council, Inc.*, 423 F.3d at 633.

If the moving party fails to comply with the rule, the motion can be denied without further consideration. Local Rule 56.1(a)(3); *Smith v. Lamz*, 321 F.3d 680, 682 n.1 (7th Cir. 2003). If the responding parting fails to comply, its additional facts may be ignored, and the properly supported facts asserted in the moving party's submission are deemed admitted. Local Rule 56.1(b)(3)(C); *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008); *Cracco*, 559 F.3d at 632; *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006). District courts are "'entitled to expect strict compliance'" with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does follow the rule's instructions *Cracco*, 559 F.3d at 632; *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir.2004). The court is not required to hunt for evidence in the record that supports a party's case if a party fails to point it out; that is counsel's task. *See Bay Area Business Council*., 423 F.3d at 633 (court properly disregarded affidavits not referenced in 56.1 submission).

The defendants have pointed out what they perceive as problems with some of the evidence Mr. Gbur has cited to in support of his Local Rule 56.1 facts. The evidence a party relies upon to

stave off summary judgment must be admissible evidence. *Sow v. Fortville Police Dept.*, 636 F.3d 293, 301 (7th Cir. 2011); *Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir.2009); *Galdikas v. Fagan,* 342 F.3d 684, 695 (7th Cir.2003) (parties cannot rely on inadmissible hearsay in summary judgment opinions). A fair portion of Mr. Gbur's evidence is not. There is hearsay – newspaper articles, bits of testimony, and affidavits, for example – that Mr. Gbur has improperly relied upon to prove the truth of the matters asserted. *See* Fed.R.Evid. 801(c); *Chi. Firefighters Local 2 v. City of Chicago,* 249 F.3d 649, 654 (7th Cir.2001)("The evidence consists of a newspaper article, which is inadmissible hearsay ..."); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997)(newspaper article inadmissible hearsay in summary judgment proceedings). And there is some unauthenticated evidence, such as a police manual, disciplinary reports, and a collective bargaining agreement. *See* Fed.R.Evid. 901; *Article II Gun Shop, Inc. v. Gonzales,* 441 F.3d 492, 496 (7th Cir.2006); *Scott v. Edinburg,* 346 F.3d 752, 760 n. 7 (7th Cir.2003); *Woods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir.2001). These problems are addressed, as necessary, throughout this opinion.

## II.

## FACTS

Mr. Gbur began his career as a patrol officer in September of 2001. (*Defendants' Rule 56.1 Statement* ("*Def.St.*"), ¶ 10; Gbur Dep., at 13). On November 18, 2002, Sergeant Eric Douglas, a white male, issued a disciplinary action memorandum to Gbur for failing to perform a pre-shift systems test of his department-issued WM Pro Wireless Transmitter Azden camera and microphone. (*Def.St.*, ¶ 10; Gbur Dep., at 31; Ex. 1). This was several months before Mayor Kellogg was elected. The memorandum stated that Mr. Gbur violated sections 2.41.01 (titled, "Violation of the Rules") and 2.41.10 (titled, "Incompetence") of the Harvey Police Department's Rules and Regulations

("Rules and Regulations") (*Def.St.*, ¶ 10; Gbur Dep. Ex.1). As a result of this incident, Mr. Gbur was suspended without pay for one day. (*Def.St.*, ¶ 10; Gbur Dep., at 31; Ex. 1). Gbur served that suspension. (Gbur Dep. 31.)

On November 9, 2002, still a few months before the election, Mr. Gbur was assigned to transport five prisoners to the Sixth District Markham Court lockup for bond hearings. (*Def.St.*, ¶ 12; Gbur Dep. Ex. 1). As Mr. Gbur was getting the prisoners in the van, one of the prisoners escaped his handcuffs and ran away. (*Def.St.*, ¶ 12; Gbur Dep., at 35; Ex. 1). After securing the four other prisoners in the van and advising dispatch of what had happened, Mr. Gbur pursued the escaped prisoner on foot. (*Def.St.*, ¶ 12; Gbur Dep., at 35). He found the prisoner four blocks away, running down an alley, and apprehended him. (*Def.St.*, ¶ 12; Gbur Dep., at 35).

As a result of this incident, on November 20, 2002, Sergeant Gerald Townsend issued a disciplinary action memorandum stating that Mr. Gbur "failed to exercise due caution at the start by not using safety precautions already in place." (*Def.St.*, ¶ 13 Gbur Dep. Ex. 1). The memorandum explained that he should have pulled his van all the way into the garage, closed the door and taken the time to make sure each individual prisoner was properly secured in handcuffs before exiting the station lockup area, that he could have gotten assistance from the two on-duty detention officers, and that he endangered the safety of the other prisoners and the public by leaving the other prisoners in the locked van while he pursued the escaped prisoner. (*Def.St.*, ¶ 13 Gbur Dep. Ex. 1). Sergeant Townsend indicated Mr. Gbur violated section 2.41.01, section 2.41.07 (titled, "Neglect of Duty"), Section 2.41.10, and section 2.41.57 (titled, "Care and Custody of Prisoner") of the Rules and Regulations. (*Def.St.*, ¶ 13 Gbur Dep. Ex. 1). As a consequence, Mr. Gbur was issued a suspension of five days without pay. (*Def.St.*, ¶ 13 Gbur Dep. Ex. 1).

Mr. Gbur had another gaffe that same day. After filling up his squad car with fuel, he pulled away from the pump while the nozzle was still in his tank, ripping the nozzle off the hose. (*Def.St.*, ¶ 11; Gbur Dep., at 32; Ex. 1). Sergeant Willie Applewhite, an African-American male, issued the disciplinary action memorandum for this incident, which stated that Mr. Gbur violated section 2.41.10 of the Rules and Regulations. (*Def.St.*, ¶ 11; Gbur Dep. Ex. 1). This resulted in a three-day suspension without pay. (*Def.St.*, ¶ 11; Gbur Dep. Ex. 1).

The next day, November 21st, Mr. Gbur failed to attend his weapons qualification. He got another disciplinary action memorandum – this one from Sergeant Douglas – which stated that Mr. Gbur violated section 2.41.01, section 2.41.10, and section 2.41.16 (titled, "Obedience to Orders") of the Rules and Regulations. (*Def.St.*, ¶ 14; Gbur Dep. Ex. 1). This cost Mr. Gbur one day off without pay. (*Def.St.*, ¶ 14; Gbur Dep. Ex. 1).

Eric Kellogg had been Mr. Gbur's football coach in high school. (Gbur Dep., at 20). When the election rolled around the following spring, Mr. Gbur did not support him in his run for mayor. (*Def.St.*, ¶ 16; Gbur Dep., at 21). At his deposition, he initially claimed this was because he was on probationary status and he was afraid of losing his job. (*Plaintiff's Rule 56.1(b)(3) Response* ("*Pl.Rsp.*"), ¶ 16; Gbur Dep., at 21). But he had to admit that his probation period had ended in September of 2002, six months before the election. (Gbur Dep., at 20-21).

Once he was elected Mayor, Mr. Kellogg appointed an African-American male, Andrew Joshua, as chief of police. (*Def.St.*, ¶ 4, 17; Joshua Dep., at 9, 11). Mr. Joshua began his career in Harvey's police department as an officer in 1987. (*Def.St.*, ¶ 4; Joshua Dep., at 9). He was promoted to the position of juvenile officer in 1996 and, from 1996 to 2001, he was commander of investigations. (*Def.St.*, ¶ 4; Joshua Dep., at 9). According to Mr. Joshua, before the 2003 election,

Mayor Kellogg promised him he would appoint him chief if he won. (*Plaintiff's Statement* ("*Pl.St.*)", ¶ 6; Joshua Dep., at 10-11). Mayor Kellogg doesn't recall his promise to Mr. Joshua. (Kellogg Dep., at 21-22). Mayor Kellogg said that he "believe[d] he could have been" a campaign supporter. (Kellogg Dep., at 21).

Mayor Kellogg also appointed Denard Eaves as deputy chief. (*Def.St.*, ¶ 17; Joshua Dep., at 46). Mayor Kellogg "believe[d] he was" one of his campaign supporters as well. (*Plaintiff's Statement*("*Pl.St.*)", ¶ 6; Kellogg Dep., at 21). Prior to this appointment, Mr. Eaves was serving a seven-year disciplinary suspension from the Harvey police force. (*Pl.St.*, ¶ 4; Eaves Dep., at 17). At his deposition, Mr. Eaves refused to say what conduct had prompted such a lengthy suspension. He said he couldn't discuss it and referred to "litigation [that] drug [sic] on for seven years." (Eaves Dep., at 17-18). According to the lawsuit – another racial discrimination suit, this one white-on-African-American – Mr. Eaves was "allegedly terminated because [he] violated various Harvey police department policies . . . ." *Barner v. City of Harvey*, 2003 WL 1720027, *3 (N.D.Ill. 2003). The case settled in September of 2006. (Case No. 95-cv-3316, Dkt. #538). So, Mayor Kellogg reinstated Mr. Eaves with a significant promotion while the question of whether his termination was warranted or racially motivated was still an open question.

Mayor Kellogg brought several other African-American officers back from disciplinary terminations: Merritt Gentry, Sam White, Angela Avant, and Darnell Kell. (*Pl.St.*, ¶ 4). The Mayor may have rued that bit of largesse; Mr. Keel and Mr. Gentry later sued him and the city for depriving them of employment benefits and promotional opportunities without due process. *Keel v. Village of Harvey*, 2011 WL 249435 (N.D.Ill. 2011). At his deposition, the Mayor explained his amnesty policy this way:

9

Q. Okay. Now, when you appointed Denard Eaves as the deputy chief back in April of 2003, were you aware that he had previously been suspended by the Harvey Police Department?

A. I was aware of a lot of unfair or racially motivated things that took place in the prior administration that was based on retaliation and harassment, so I certainly was aware of some of the things that was [sic] bogusly trumped up against Mr. Eaves.

Q. So you believe that Mr. Eaves was – that his term – his previous discipline or termination was racially motivated?

A. Again I can only speak to the fact that the previous administration under the direction of Mr. Mayor Graves didn't conduct city business in a manner that was fair and equitable.

\*     \*     \*

Q. And were you aware of the fact that [Mr. White] was previously terminated by the Harvey Police Department prior to April of 2003?

A. I was also – and the record will reflect that my license was suspended on bogus charges by the same kangaroo court that was doing those suspensions. So the individuals that was [sic] issuing the – the suspensions, to me, certainly were not men of character, honor. And then so certainly those individuals might've had some blemishes that was [sic] created from the previous administration that was [sic] based on race, harassment and retaliation, so certainly they probably had some – some issues. As an alderman, I had issues with them, too, so it – it wouldn't surprise me.

Q. Did you have personal knowledge or any facts that would lead you to believe that Mr. White was terminated from the previous administration because of race?

A. I can only speak on my experiences and the way that I was treated as an alderman and some of the other things that I observed as alderman.

(*Pl.St.*, ¶ 7; Kellogg Dep., at 22, 27-28). The four reinstated officers were immediately given the rank of commander. (*Pl.St.*, ¶ 5; Ex. 17). According to Mr. Joshua, these "promotions' came directly from the mayor. (*Pl.St.*, ¶ 5; Joshua Dep., at 88, 107). At the same time, three former commanders – all white – were demoted to the rank of sergeant. (*Pl.St.*, ¶ 4; Ex. 17). On the personnel orders, no reasons are given for any of these moves. (*Pl.St.*; Ex. 17).

Now back to Mr. Gbur's career.  Things didn't start out so badly after the election.  Shortly after he was elected, Mayor Kellogg called Mr. Gbur at home and offered him an assignment in investigations – a step up – which he accepted after a bit of deliberation.  (*Def.St.*, ¶ 20; Gbur Dep., at 18-19).  But the defendants' evidence is conflicting on this point because they also point to testimony from Mr. Joshua that it was *his* decision to promote Mr. Gbur.  (*Def.St.*, ¶ 19; Joshua Dep., at 35).

It wasn't long before Mr. Gbur became uncomfortable in the new position and began asking for a reassignment to patrol, in December 2003.  (*Def.St.*, ¶ 22; Gbur Dep., at 18).  Mr. Gbur then expressed interest in the canine division to Mr. Joshua.  (*Def.St.*, ¶ 4; Joshua Dep., at 9).  Mr. Joshua placed him in the next available class, and he became a canine officer in March 2004. (*Def.St.*, ¶ 19, 22; Gbur Dep., at 16-18; Joshua Dep., at 9).  This promotion came with an extra hour of pay per day. (*Def.St.*, ¶ 22; Joshua Dep., at 118; Gbur Dep., at 15).

The promotion also came after another disciplinary problem for Mr. Gbur.  On November 15, 2004, Sergeant Kevin Ramsey issued a disciplinary action memorandum because Mr. Gbur had failed to meet the minimum work standards for the month of October 2004 as a patrol officer. (*Def.St.*, ¶ 23; Gbur Dep., at 39; Ex. 1).  According to Sergeant Ramsey's memorandum, this was a violation of Section 2.41.10 of the Rules and Regulations. (*Def.St.*, ¶ 22; Gbur Dep. Ex. 1).  Mr. Gbur was given a written reprimand. (*Def.St.*, ¶ 22; Gbur Dep., at 39; Ex. 1).

On January 27, 2005, Sergeant Andrew Bell issued a disciplinary action memorandum stating that Mr. Gbur had failed to report to his assignment at Brooks Jr. High School.  (*Def.St.*, ¶ 24; Gbur Dep., at 40; Ex. 1). That constituted a violation of section 2.41.01 and section 2.41.07 of the Rules and Regulations. (*Def.St.*, ¶ 24; Gbur Dep. Ex. 1).  While the memorandum stated that Mr.

Gbur would be suspended without pay for one day, Mr. Gbur testified that he was actually paid for the day that he was suspended. (*Def.St.*, ¶ 24; Gbur Dep., at 42; Ex. 1). Mr. Gbur does not know of any other patrol officers who failed to show up for assignment at the junior high school. (*Def.St.*, ¶ 24; Gbur Dep., at 43).

Mr. Gbur failed to show up for court appearances on December 8, 2004, and January 12, 2005, and did not call in. (*Def.St.*, ¶ 25; Gbur Dep., at 44; Ex. 1; Kellogg Dep., at 44). Sergeant James Brooks, an African American, wrote him up on February 18, 2005, for violating section 2.41.01, section 2.41.10, and section 2.41.37 (titled, "Court Attendance and Conduct") of the Rules and Regulations. (*Def.St.*, ¶ 25; Gbur Dep. Ex. 1). It cost Mr. Gbur a day's suspension without pay. (*Def.St.*, ¶ 25; Gbur Dep. Ex. 1). Mr. Gbur says he was at court, but there was no court reporter to sign in with. (Gbur Dep., at 45). He testified that he believed Lionel Smith, an African-American male, also received a write-up for the same thing. (*Def.St.*, ¶ 25; Gbur Dep., at 45). Mr. Gbur says he filed a grievance regarding the discipline but "never heard back on any of it." (Gbur Dep., at 45).

In 2005, Mr. Gbur and some other police officers spoke with Sandra Alvarado, the chief of police's assistant, to complain that he and some others weren't "getting a fair shake" in terms of appointments and tell her that they were going to have to file a grievance. (*Def.St.*, ¶ 26; Gbur Dep., at 60). Mr. Gbur says that Ms. Alvarado replied, "man, fuck all them white mother fuckers. They—they used to be part of Nick Graves' clique, and now they hate it that they ain't part of Kellogg's, and that's too bad. I don't—I don't care about them." (*Def.St.*, ¶ 26; Gbur Dep., at 60). Ms. Alvarado denies making this comment. (*Def.St.*, ¶ 26; Alvarado Aff. ¶ 13).

On April 6, 2006, Mr. Gbur spoke with investigators from the Department of Justice who had come in to look into charges of racial discrimination in Harvey's police department. (*Def.St.*,

¶ 27; Gbur Dep., at 62). He told the interviewers that Deputy Chief Eaves and Chief Joshua referred to him as "white boy." (*Def.St.*, ¶ 27; Gbur Dep., at 63). At some point, Mr. Gbur told an attorney for the City of Harvey that he felt that there was racial discrimination occurring in Harvey's police department. (*Def.St.*, ¶ 28; Gbur Dep., at 65). He explained that "Mayor Kellogg took care of me when he first came in or wanted to and am I going to have to worry about them coming back at me or, you know, me losing my job . . . ." (*Def.St.*, ¶ 28; Gbur Dep., at 65). That attorney told Mr. Gbur that they couldn't fire him and that the attorney would advise them that it would be illegal to do so. (*Def.St.*, ¶ 28; Gbur Dep., at 65). Mr. Gbur hired an attorney on April 23 or 24, 2006, who gave him EEOC forms that he and other officers could fill out if they felt they had been discriminated against by Harvey. (*Def.St.*, ¶ 29; Gbur Dep., at 66).

On May 8, 2006, Commander Annette Avant issued a disciplinary action memorandum stating that Mr. Gbur had failed to appear at Markham Court for his scheduled court day on April 3, 2006. (*Def.St.*, ¶ 30; Gbur Dep., at 46; Ex. 1). Commander Avant wrote that Mr. Gbur violated section 2.41.01, section 2.41.10, section 2.41.16, and section 2.41.37 of the Rules and Regulations. (*Def.St.*, ¶ 30; Gbur Dep.; Ex. 1). As a result, Mr. Gbur was suspended without pay for one day. (*Def.St.*, ¶ 30: Gbur Dep.; Ex. 1). Apparently immediately after that, on the same day, Mr. Gbur filed a charge with the EEOC alleging his employer discriminated against him based on his race and color. (*Def.St.*, ¶ 31; Gbur Dep., at 67–68; Ex. 2). Specifically, the charge stated:

> 1. I have been employed as a police officer by the City of Harvey from 10 Sept 2001 to the present. I am a white male.
>
> 2. Starting in about 2003, the City of Harvey implemented a practice of filling vacant supervisory positions in its police department with African American and Hispanic persons.

> 3. I am qualified to be promoted to sergeant but I have not been able to apply for that promotion because of the above referred employment practice.

(*Def.St.*, ¶ 31; Gbur Dep.; Ex. 2). Mr. Gbur agrees that he was not making a hostile work environment or retaliation charge. (*Def.St.*, ¶ 31; Gbur Dep., at 68; Ex. 2; *Pl.Rsp.*, ¶ 31).[2]

Before he filed his EEOC charge, Mr. Gbur told Chief Joshua what he was going to do. (*Def.St.*, ¶ 32; Gbur Dep., at 150). The chief told Mr. Gbur he appreciated the heads-up and told him he had a good case. (*Def.St.*, ¶ 32; Gbur Dep., at 151). When asked at his deposition whether he thought Chief Joshua retaliated against him after that, Mr. Gbur testified:

> I can't say yes or no. I can't. I mean – no, I don't. Because I don't feel he did anything specifically to me that I can name right here and now.

(*Def.St.*, ¶ 32; Gbur Dep., at 151).

On September 26, 2006, Mr. Gbur was scheduled to work the midnight shift. (*Def.St.*, ¶ 34; Gbur Dep., at 75). He showed up for his shift, and the sergeant in charge assigned him to squad car number 2105, which Mr. Gbur described as an old Crown Victoria with no computer, without functioning dashboard lights, without a dome light, without a spotlight, and with malfunctioning red and blue lights. (*Def.St.*, ¶ 34; Gbur Dep., at 75-77, 99). The other four officers on duty that night were all assigned new Impalas. (*Def.St.*, ¶ 34; Gbur Dep., at 88). The police department had about eight new Impalas, and about 12 older Crown Victorias in its fleet. (*Def.St.*, ¶ 34; Gbur Dep., at 87–88). Mr. Gbur went up the chain of command to request a safer vehicle, but Commander Roy Wells told him to take the car he was assigned. (*Def.St.*, ¶ 34; Gbur Dep., at 76). Mr. Gbur then

---

[2] Mr. Gbur makes no mention that he was denied a promotion on any basis – race or retaliation – in his second amended complaint. He also does not assert that he was denied a promotion in his Local Rule 56.1 submissions – in fact, he states that Chief Joshua promoted him and gave him favorable positions. (*Pl.St.*, ¶ 16). Moreover, he does not advance any argument regarding a lost promotion in his brief.

called Norm Fries, who works for the union, and Fries told him that he would grieve the car assignment in the morning. (*Def.St.*, ¶ 35; Gbur Dep., at 76, 85). According to Mr. Gbur, Mr. Fries also told him he was meeting with Mayor Kellogg, that the meeting was secret, and that Mayor Kellogg "got wind that [Gbur] was backing" Kellogg's opponent, Marian Beck, and was "not too happy" with him. (*Def.St.*, ¶ 35; Gbur Dep., at 77).[3]

The squad car assignment prompted the union to file a grievance on Mr. Gbur's behalf for faulty and unsafe equipment. (*Def.St.*, ¶ 36; *Pl.Rsp.*, ¶ 36). Mr. Harris, the union president, testified that he took the grievance to Chief Joshua and Deputy Chief Eaves, and that Mr. Eaves said that "the white boys was [sic] mad anyway that we're running the department now." (*Def.St.*, ¶ 36; Harris Dep., at 21). Mr. Harris further alleges that Mr. Eaves said, "This is some more BS from Gbur. We'll take care of that problem with him." (*Def.St.*, ¶ 36; Harris Dep., at 18–19). Chief Joshua did not say anything that was racial at the meeting. (*Def.St.*, ¶ 36; Harris Dep., at 25). Chief Joshua denies hearing Mr. Eaves make the statements alleged by Mr. Harris, but Chief Joshua also said that he didn't recall being at any meeting, and that he thought Mr. Eaves handled the whole matter. (*Def.St.*, ¶ 36; (Joshua Dep., at 43-47). To the contrary, Mr. Eaves denies that he was ever involved with a grievance from Mr. Gbur regarding faulty equipment and that Chief Joshua took care of all grievances. (*Def.St.*, ¶ 36; Eaves Dep., at 51-52). And, Mr. Eaves denies making the comments Mr. Harris attributed to him and said Mr. Harris was an habitual liar. (*Def.St.*, ¶ 36; Eaves Dep., at 58-59). Moreover, Mr. Eaves claims that, during his time of employment with the City of Harvey, he never once made any anti-white comments. (*Def.St.*, ¶ 36; Eaves Dep., at 58).

---

[3] The defendants properly object to this statement as inadmissible hearsay. But the record also contains the testimony of Mr. Fries and Mr. Harris as to what the mayor told them at the meeting, and that is not hearsay. Fed.R.Civ.P. 803(3).

Mr. Harris, Mr. Fries, Mayor Kellogg, and Detective Archie Stallworth met at Stallworth's house prior to the 2007 mayoral election. (*Def.St.*, ¶ 37; Harris Dep., at 15). Mr. Fries brought up Mr. Gbur's grievance regarding the faulty vehicle with the mayor. (*Def.St.*, ¶ 37; Harris Dep., at 17). Mr. Harris claims that Mayor Kellogg responded, "My administrators will take care of him." (*Def.St.*, ¶ 37; Harris Dep., at 18). Mayor Kellogg denies making this statement. (*Def.St.*, ¶ 37; Kellogg Dep., at 79). According to Mr. Harris, Mayor Kellogg said that Mr. Gbur was "backing" a different mayoral candidate," but didn't make any racial remarks regarding Mr. Gbur. (*Def.St.*, ¶ 37; Harris Dep., at 43, 52).

Mr. Gbur did back Marian Beck in that election, but not in any official capacity. (*Def.St.*, ¶ 38; Gbur Dep., at 71). He helped her make signs for her campaign and handed out literature in January 2007 (*Def.St.*, ¶ 38; Gbur Dep., at 72-73), which was after Chief Joshua filed Mr. Gbur's termination notice on November 1, 2006. (*Def.St.*, ¶ 44; Gbur Dep. 10; Joshua Dep. 48-49). Mr. Gbur never spoke to Mayor Kellogg, or any person in the city administration, regarding the 2007 election campaign, and no one spoke to him. (*Def.St.*, ¶ 38; Gbur Dep. 74-75). Chief Joshua says he was unaware that Mr. Gbur backed Ms. Beck in her run against Mayor Kellogg. In the 2007 election. (*Def.St.*, ¶ 38; Joshua Dep. 65–66). According to Mayor Kellogg, "a host of city employees" worked with candidates that ran against him in 2007. (*Def.St.*, ¶ 39; Kellogg Dep., at 90). When asked to identify someone – anyone – by name, Mayor Kellogg said, "[w]ell, again, it – it – you know there's – there were a lot of different names that surfaced." (*Def.St.*, ¶ 39; Kellogg Dep., at 91). When pressed for at least one, he testified:

> Well, some individuals gave the name of Sergeant Brooks. Uh, let's see, who else?
> I even heard names of Commander Wells, I mean I believe, you know. So I mean,

16

I can't really be 100 percent, you know, but . . . I don't really focus on people who
work against me because I – I just try to, you know."

(Kellogg Dep., at 91).[4]

The beginning of the end of Mr. Gbur's tenure with Harvey's police department came on
September 25, 2006. While he was on his way to work in a department vehicle, he stopped at a gas
station, and someone told him the car was damaged. When he reported for duty, he informed
Commander Wells that "somebody hit [his] vehicle on the back passenger side when it was parked
at [his] house." Mr. Gbur told Sergeant Darren Mines, his supervisor, that his vehicle had been
struck in a hit-and-run. The two of them went to Mr. Gbur's house in Thornton, Illinois, to view the
scene where the damage had occurred, but didn't notice anything on the street. They then went to
the Thornton police department to file an accident report. In it, Mr. Gbur stated that the vehicle was
struck by an unknown vehicle in the right rear quarter panel while it was parked in front of 117
Indianwood Drive, Thornton, Illinois. (*Def.St.*, ¶ 40; Notice of Discharge).

The next day, September 26th, Mr. Gbur gave Sergeant Mines a written statement that "the
only time the vehicle could have been struck, for me not to know about it, was as the squad was
parked out infront [*sic*] of my home." (*Def.St.*, ¶ 40; Notice of Discharge ¶ 10(o)). Sergeant Mines
went to Mr. Gbur's house around 4:30 a.m. on September 26, 2006, and observed a red fire hydrant

---

[4] Mr. Gbur submitted an affidavit in which he maintained that, aside from him, it was never
publicized or discussed whether individuals worked against Mayor Kellogg in the election. (*Pl.Rsp.*, ¶ 38;
Ex. 3). But Mr. Gbur would not know what was discussed outside his presence, and thus is testimonially
incompetent to make the statement he did in his affidavit insofar as it related to such discussions. *See* Rule
602, Federal Rules of Evidence. Fed.R.Civ.P. 56(e)(1) requires that affidavits opposing summary judgment
"must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the
affiant is competent to testify on the matters stated." *See also* Rule 602, Federal Rules of Evidence; *Celotex
Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Compania Administradora de Recuperacion de Activos
Administradora de Fondos de Inversion Sociedad Anonima v. Titan Intern., Inc.*, 533 F.3d 555, 562 (7th Cir.
2008)

in Mr. Gbur's front yard, from which he collected fragments of what appeared to be a taillight. (*Def.St.*, ¶ 41; Notice of Discharge ¶ 10(q)). Later that day, pictures of the damaged vehicle were taken. They showed a crease in the rear passenger side quarter panel with red paint markings that matched the red paint on the fire hydrant. (*Def.St.*, ¶ 41; Notice of Discharge ¶ 10(t), (u)). Sergeant Mines also observed silver or gray paint transfer on the fire hydrant that matched the silver or gray paint on the damaged squad car. (*Def.St.*, ¶ 41; Notice of Discharge ¶ 10(v)). Around noon, Mr. Gbur was ordered to return to the police station (apparently the Harvey police station although the document does not specify) to submit to urinalysis. (*Def.St.*, ¶ 41; Notice of Discharge ¶ 10(w)).

Mr. Gbur finished his shift during the afternoon of the 26th and went home. He called his supervisor and told him, "there's a red fire hydrant in front of my house and that I couldn't confirm it if this is where the damage came from, but its possible." (*Def.St.*, ¶ 42; Notice of Discharge ¶ 10(y)). Later, Mr. Gbur gave Sergeant Mines a second written statement saying that he "observed that a red fire hydrant that is on the street infront [*sic*] of said location had minor, possible, gray paint, and possible impact marks on said property." (*Def.St.*, ¶ 42; Notice of Discharge ¶ 10(z)). Mr. Gbur never amended or supplemented the accident report he filed with the Thornton police department. (*Def.St.*, ¶ 42; Notice of Discharge ¶ 10(*l*)).

Mr. Gbur was suspended on or around October 13, 2006, and his pay was stopped on or around October 24, 2006. (*Def.St.*, ¶ 43; Gbur Dep., at 14). On November 1, 2006, Chief Joshua filed charges with the police commission against Mr. Gbur relating to the September 25, 2006 incident. (*Def.St.*, ¶ 44; Gbur Dep., at 10; Joshua Dep., at 48). The decision to file the termination charges was Chief Joshua's alone. (*Def.St.*, ¶ 44; Joshua Dep., at 49). Mr. Gbur agrees that Chief

Joshua's recommendation to terminate Mr. Gbur was not based on race, or made in retaliation for any protected activity he engaged in. (*Def.St.*, ¶ 44; *Pl.Rsp.*, ¶ 44). Mr. Gbur claims that Chief Joshua told him in August 2008 ". . . time's gone by and you haven't wavered; and you know, I think maybe it was an actual accident . . . ." (*Pl.Rsp.*, ¶ 44, Gbur Dep., at 109-110). When Mr. Gbur asked why, if that was the case, he fired him, he claims Chief Joshua told him he "didn't fire [him]; Sandra Alvarado fired [him]. Roy Wells fired [him]. Denard Eaves fired [him]. Mayor Kellogg fired [him]." (*Pl.Rsp.*, ¶ 44, Gbur Dep., at 109-10).

Chief Joshua held a *Loudermill* hearing[5] in his office on November 1, 2006, which Mr. Gbur attended with his attorney. (*Def.St.*, ¶ 45; Gbur Dep., at 10). In addition, the Civil Service Commission of the City of Harvey held two hearings regarding Mr. Gbur's termination: one on January 30, 2007, and one on February 21, 2007. (*Def.St.*, ¶ 45; Gbur Dep., at 10–11). Mr. Gbur was represented by counsel and testified under oath at the January 30, 2007 hearing, and other officers testified in his behalf at the February 21, 2007 hearing. (*Def.St.*, ¶ 46; Gbur Dep., at 11–12).

At the Civil Service Commission hearing,[6] Mr. Gbur testified that during the late morning of September 25, 2006, he pulled his vehicle forward and ran over a large ball. He found this out from a neighbor; all he knew at the time was that he heard a loud bang and his car shook. (*Def.St.*,

---

[5] The name of the proceeding is taken from *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), which dealt with due process requirements in the event of a termination of a tenured, public employee. The Court stated that "[t]he essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. . . .The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. at 546.

[6] The defendants refer to a "Police Commission Hearing" in their statement of facts, but there was apparently no such hearing. The hearing the defendants draw their factual assertions from was clearly identified as the Civil Service Commission Hearing. (Notice of Discharge, at 1).

¶ 47; Notice of Discharge ¶ 10(bb)-(dd)). He further testified that he got out of his vehicle because he thought he had blown a tire, saw the ball, picked it up, returned to the vehicle, and drove away. (*Def.St.*, ¶ 47; Notice of Discharge ¶ 10(ee)). Mr. Gbur said that as he drove away, he "put the car in reverse, hit the fire hydrant and then drove away, but did not know it." (*Def.St.*, ¶ 47; (Notice of Discharge ¶ 10(ff)). Kimberly Newton, Mr. Gbur's neighbor and a witness to the incident, testified that "from all the adrenalin, being upset, thinking he might have blown a tire, he probably thought the car was in drive, and in actuality, he was in reverse and accidentally backed up and hit the fire hydrant." (*Def.St.*, ¶ 48; Notice of Discharge ¶ 10(kk)). When he hit the fire hydrant, it moved. (*Def.St.*, ¶ 48; Notice of Discharge ¶ 10(kk)).

The Commission didn't believe that Mr. Gbur could have struck the hydrant with enough force to move it, yet not know he hit something. (*Def.St.*, ¶ 49; Notice of Discharge ¶ 10(oo)). It also noted that Mr. Gbur lied to his commander, his sergeant, and the Thornton police department when he said it had been a hit-and-run, and had never mentioned running over the ball or the loud bang to anyone. (*Def.St.*, ¶ 49; Notice of Discharge ¶ 10(tt)). The commission recounted Mr. Gbur's past disciplinary problems, and determined that he had violated a laundry list of regulations, including those dealing with conduct unbecoming, incompetence, submitting truthful reports, damaging departmental equipment and vehicles, and reporting accidents. (*Def.St.*, ¶ 50; Notice of Discharge ¶ 10(ww)). The commission ordered him discharged for cause on March 21, 2007. (*Def.St.*, ¶ 50; Notice of Discharge, at 16).

Mr. Gbur filed a complaint seeking only administrative review in the Circuit Court of Cook County naming the City of Harvey Civil Service Commission and Police Chief Joshua as defendants. (*Def.St.*, ¶ 51; Circuit Court Order). The Circuit Court affirmed the order of the Police

Commission, which constituted a final judgment on the merits. (*Def.St.*, ¶ 51; Circuit Court Order).

Mr. Gbur appealed, and the Illinois Appellate Court also affirmed the order of the Police

Commission. (*Def.St.*, ¶ 51; Appellate Court Order).[7]

Between the hearing and the commission's decision, Mr. Gbur filed a second charge with

the EEOC, on March 15, 2007. (*Def.St.*, ¶52; Gbur Dep., at 68; Ex. 3). In this charge, Mr. Gbur

alleged that he had been discriminated against based on his race and color, and alleged:

> 1. I was employed as a police officer by the City of Harvey from 10 September, 2001 until 2006. I am a white male.
>
> 2. I was suspended without pay on October 26, 2006 for alleged misconduct and subsequently discharted [sic] for the same alleged misconduct.
>
> 3. During the same period, the City of Harvey continued to pay at least two African-American police officers who had engaged in very serious misconduct and has refused to fire several African-American police officers who have engaged in very serious serious [sic] misconduct.
>
> 4. I was suspended without pay and discharged because of my race (white).

(*Def.St.*, ¶52; Ex. 3).

After leaving Harvey's police department, Mr. Gbur worked part-time as a patrol officer for

the City of Posen for a year. (*Def.St.*, ¶54; *Pl.Rsp.*, ¶ 54). He started working part-time for the City

of Markham as a patrol officer on May 1, 2008, working roughly 24 hours each week and being paid

by the hour. (*Def.St.*, ¶54; *Pl.Rsp.*, ¶ 54; Gbur Dep., at 5-6). According to Mr. Gbur, Acting Chief

Denard Eaves, who replaced Chief Joshua, attempted to "blackball" him by contacting the Markham

police department when Mr. Gbur sought employment there. Mr. Eaves denies ever having any

contact with any individuals from Posen or Markham's police departments. (*Def.St.*, ¶53; *Pl.Rsp.*,

---

[7] Mr. Gbur takes issue with these facts, calling them "legal arguments" and improper for inclusion in a Local Rule 56.1 statement. (*Pl.Rsp.*, ¶ 51). But he doesn't expound on his contention or explain how the reference that accurately describes the decisions as upholding his termination under Illinois' Administrative Review Law constitute a "legal argument."

¶ 53; Eaves Dep. 49–50). But the Markham deputy police chief, Tony DuBois, in a statement taken over the telephone on April 2, 2009 – that he later signed – states that Mr. Eaves did contact him to inform him that the Harvey police department fired Mr. Gbur and asked why, given that, the Markham police department was hiring him. (*Pl.St.*, ¶ 42; Ex. 8). The odd thing about this piece of evidence is that the interviewer and Mr. DuBois dated the signatures of that document May 5, 2008, about a year before the interview.

Moreover, it was not signed by a notary until a year after the dates of those signatures – May 5, 2009. It is, of course, a common mistake for people to write the previous year on documents early in the new year, but May is well into the new year. Still, the Seventh Circuit has stated that "so long as the documents comply with 28 U.S.C. § 1746, and in the interests of justice, a district court should not be unnecessarily hyper-technical and overly harsh on a party who unintentionally fails to make certain that all technical, non-substantive requirements of execution are satisfied." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).[8]

Apart from the oddity of the DuBois statement, Mr. Eaves' "attempt[ ] to 'blackball'" Mr. Gbur would not appear to state a claim upon which relief can be granted. Perhaps it has evidentiary significance under Rule 404(b), but that would appear to be its only significance.

---

[8] Under 28 U.S.C. §1746, if a person's unsworn declaration is used in a summary judgment proceeding, it must be "subscribed by him, as true under penalty of perjury, and dated . . . ." *See Owens v. Hinsley*, 635 F.3d 950, 954-55 (7th Cir. 2011). Here, the interviewer related the statement of the declarant in writing, and the subscription reads, "I attest that the above information given in this interview is true and correct."

## III.
## ANALYSIS

### A.
### The *Rooker-Feldman* Doctrine Does Not Apply In This Case

The defendants begin by arguing that the *Rooker-Feldman* doctrine bars Mr. Gbur's Title VII and Section 1983 claims. The doctrine derives its name from two Supreme Court decisions decided sixty years apart: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). It is a jurisdictional bar that prohibits federal district courts from reviewing final state court judgments. It springs from the principle that district courts have only original jurisdiction; the Supreme Court alone has appellate jurisdiction over state court judgments. *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 603(7th Cir. 2008).[9] Here, the defendants submit that the Title VII and §1983 claims are simply attacks on the state courts' findings that his termination was justified, and thus must be dismissed for want of jurisdiction.

Under the *Rooker-Feldman* doctrine, lower federal courts lack subject-matter jurisdiction when, after state proceedings have ended, a losing party in state court files suit in federal court complaining of an injury caused by the state-court judgment and seeking review and rejection of that judgment. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284 (2005). In determining whether a federal plaintiff seeks review of a state-court judgment, a court must ask whether the injury alleged resulted from the state-court judgment itself; if it does, *Rooker-Feldman* bars the claim. *Beth-El All Nations Church v. City of Chicago*, 486 F.3d 286, 292 (7th Cir. 2007); *Centres, Inc. v. Town of Brookfield, Wis.,* 148 F.3d 699, 701-02 (7th Cir.1998). If the injury is

---

[9] The exception to the Congressional mandate that district courts only have original jurisdiction is that federal district courts may review *habeas corpus* claims brought by state prisoners. 28 U.S.C. § 2254.

independent of the state-court judgment, or if the federal claim alleges "a prior injury that a state court failed to remedy," *Rooker-Feldman* is inapplicable. *Beth-El*, 486 F.3d at 292; *Centres, Inc.*, 148 F.3d at 702. That's what Mr. Gbur is alleging here – a prior injury that the state court left unremedied – not an injury that stemmed from the state court proceedings.

Examples of such state court injuries include cases like *Golden v. Helen Sigman & Associates, Ltd.*, 611 F.3d 356 (7th Cir. 2010) and *Gilbert v. Illinois State Bd. of Educ.*, 591 F.3d 896 (7th Cir. 2010). In *Golden*, the plaintiff lost custody of his daughter through the apparently biased efforts of the court-appointed child advocate, who, he alleged, acted in concert with his estranged wife's attorneys. 611 F.3d at 361. Holding that *Rooker-Feldman* barred the plaintiff's federal claim, the Seventh Circuit explained:

> the only injury that [plaintiff] alleges that he has suffered from [the child advocate's] supposedly biased advocacy is the alienation of [his daughter's] affections and a reduction in his custodial rights. These harms flow directly from the fruit of [the child advocate's] efforts: state-court custody orders favorable to [the wife].

611 F.3d at 362. Here, the injury Mr. Gbur alleges was his termination as a police officer, resulting from the acts of Markham officials, not the result of the state court proceedings.

In *Gilbert*, the plaintiff was terminated from his tenured teaching position. At the administrative proceeding, the school district alone presented evidence. The plaintiff moved for a judgment in his favor when the school district rested. The hearing officer granted his motion and ordered his reinstatement. When the district appealed, the state trial court affirmed but that appellate court reversed and ordered the plaintiff's termination be reinstated. The ruling apparently foreclosed the plaintiff's opportunity to present evidence rather than simply return the parties to the *status quo* of the administrative proceeding. 591 F.3d at 899-900. Because the appellate court simply ordered

24

that the plaintiff's termination be reinstated without further administrative proceedings, the plaintiff's injury flowed directly from the appellate court's decision. 591 F.3d at 900.

The court's observation in *Zurich American Insurance Co. v. Superior Court for the State of California*, 326 F.3d 816, 822 (7th Cir. 2002) is applicable here: "[Plaintiff's] injury was not caused by the state court, but by its adversary's conduct . . .; its only gripe with the state court is that it failed to remedy that conduct. . . .[Plaintiff's] federal claim simply seeks to bypass the state court's order, and does not directly attack it, so *Rooker-Feldman* does not apply." Again, in the instant case, Mr. Gbur is not complaining that the state court rulings caused him harm; it was his adversary's conduct that injured him.

Moreover, aside from an unamplified and conclusory assertion that Mr. Gbur "is bringing Title VII and §1983 claims that attack the circuit court's finding that his termination was justified" (*Defendants' Memorandum*, at 4), the defendants' brief does not really analyze why *Rooker-Feldman* applies, and does not attempt to distinguish the situation in this case from those in cases like *Golden* or *Gilbert*. The brief does, however, cite *Manley v. City of Chicago*, 236 F.3d 392 (7th Cir. 2001)(Williams, J. (with Rovner and Wood)), which certainly seemed to apply the *Rooker-Feldman* doctrine under circumstances that parallel those here. However, the brief does not go beyond the citation to the case. One must go farther to understand *Manley*'s true meaning.

In *Manley*, a police officer who was fired unsuccessfully challenged his termination in state court and then brought federal due process and equal protection claims in the district court. The Seventh Circuit concluded that the *Rooker-Feldman* doctrine applied because "[plaintiff's] injury stems from the state court judgment upholding the decision to terminate him made by an administrative board." 236 F.3d at 397. This holding would seem to contravene other cases holding

25

that the doctrine did not apply where the plaintiff is seeking to remedy a "prior injury that a state court failed to remedy." *Long v. Shorebank Development Corp.*, 182 F.3d 548, 555 (7th Cir. 1999); *Centres, Inc. v. Town of Brookfield, Wis.*, 148 F.3d 699, 702 (7th Cir. 1998); *Garry v. Geils*, 82 F.3d 1362, 1367 (7th Cir. 1996). The court even cited to *Long* and *Garry* in its opinion, even though the result seemed to depart from the rationale of those cases.

The Seventh Circuit retreated – as we shall see, "explained" is perhaps the more apt term – from *Manley* almost immediately thereafter in *Durgins v. City of East St. Louis, Illinois*, 272 F.3d 841, 844-45 (7th Cir. 2001). Judge Easterbrook was the panel's spokesman. Judges Rover and Williams were on the panel, as they were in *Manley*. *Durgins* was another case in which a police officer challenged a termination in state court and then challenged it in federal court under §1983. On appeal, the defendant relied extensively on *Manley* to argue that *Rooker-Feldman* applied. (Appellee's Brief, at 1-5).

The Seventh Circuit disagreed. Here is how Judge Easterbrook explained the difference in result and the real meaning of *Manley:*

> *Manley* applied the *Rooker- Feldman* doctrine to materially identical circumstances. When *Rooker- Feldman* applies, there is no federal jurisdiction and a dismissal is not on the merits. Normally the *Rooker- Feldman* doctrine applies when the injury is inflicted by the state court's decision, while if all the state court has done is fail to rectify an injury caused by some other actor then claim preclusion is the appropriate doctrine. See, e.g., *Homola v. McNamara*, 59 F.3d 647 (7th Cir.1995); *GASH Associates v. Rosemont*, 995 F.2d 726 (7th Cir.1993). This understanding places a suit such as Durgins's on the preclusion side of the line: the injury comes from her discharge, not from the state court's failure to order her reinstatement.
>
> *Manley* applied the *Rooker-Feldman* doctrine not because of any disagreement with this understanding . . . (or with the holdings of *Davis*, *Pirela*, and *Hagee*) but because the parties themselves couched their arguments in *Rooker- Feldman* terms. The district court dismissed Manley's suit under the *Rooker- Feldman* doctrine. Instead of arguing that preclusion rather than *Rooker- Feldman* is the right lens, Manley contended that "his claims should not have been dismissed under the *Rooker-*

*Feldman* doctrine because they could not have been brought in state court." 236 F.3d at 396. This "because" clause concerns the scope of claim preclusion-particularly, the propriety of joinder in state court-rather than any subject that matters to application of the *Rooker- Feldman* doctrine. In sum, *Manley* is a preclusion decision in *Rooker- Feldman* clothing. We understand it as a preclusion decision because otherwise it would effectively overrule . . . three decisions that it avowedly followed.

272 F.3d at 844-45.[10]

The upshot of all this is that *Manley* is not really a *Rooker-Feldman* case after all, but a *res judicata* case and thus is not supporting the defendants' *Rooker-Feldman* argument. It is relevant, however, to their *res judicata* argument.

### B.
### *Res Judicata* Precludes Mr. Gbur's Claims Regarding Discrimination And/Or Retaliation In Connection With His Suspension And Termination And The Antecedent Investigation

As a partial alternative to *Rooker-Feldman*, the defendants argue that *res judicata* precludes Mr. Gbur from bringing his claims that he suffered discriminatory or retaliatory investigation, suspension, or termination, because he already litigated these claims in state court. For *res judicata* to apply, three factors are necessary: (1) an identity of the parties or their privies; (2) an identity of the cause of action; and (3) a final judgment on the merits [in the earlier action]. *Johnson v. Cypress Hill*, 2011 WL 2138085, *5 (7th Cir. 2011); *Prochotsky v. Baker & McKenzie*, 966 F.2d 333, 334 (7th Cir. 1992). Mr. Gbur concedes that the state court proceeding involved the same parties or their privies. (*Plaintiff's Memorandum*, at 17). But the plaintiff argues that, because his federal

---

[10] Judge Hamilton, while a district judge presciently said this about *Manley:* "That reasoning in *Manley* certainly seems to apply here, but it also seems to run contrary to the decisions drawing a distinction between the *Rooker-Feldman* doctrine and res judicata. The *Manley* opinion did not directly address that distinction, however, and this court respectfully suggests that res judicata and/or issue preclusion might have been more directly applicable there. In view of the Seventh Circuit's repeated and explicit attempts to maintain the distinction, this court follows the teaching of *Garry, Homola,* and *GASH Associates,* and denies defendants' motion to dismiss for lack of subject matter jurisdiction." *Network Towers, LLC v. Town of Hagerstown,* 2002 WL 1364156, 5 (S.D.Ind. 2002).

complaint involves claims of "race discrimination, race retaliation, first amendment retaliation, and political retaliation . . . [t]here was no decision on the merits of those claims as not one of those causes of actions [sic] were decided in the state court administrative review." (*Plaintiff's Memorandum*, at 17). Thus, he contends, the defendants cannot establish the second or third of the requisite factors.

First, the third factor – a final judgment on the merits is clearly established. The decision of the Illinois Appellate Court in Mr. Gbur's case, (*see* Defendants' Rule 56. Statement, ¶51, Ex. Appellate Court Order), is a final decision on the merits. *Licari v. City of Chicago*, 298 F.3d 664, 667 (7th Cir. 2002). Second, it does not really matter that Mr. Gbur did not advance those discrimination and retaliation claims in the state court proceedings. The point is that he *could* have. A judgment "'bec[o]me[s] res judicata to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'" *Salazar v. Buono*, – U.S. –, –, 130 S.Ct. 1803, 1815 (2010). The law is clear that Mr. Gbur could have presented his Title VII discrimination claims and his §1983 retaliation claims in the Illinois state court proceedings. *Garcia v. Village of Mount Prospect*, 360 F.3d 630, 641-42 (7th Cir. 2004).

In his response brief, Mr. Gbur makes no argument that he attempted to bring these claims in state court but was somehow prevented from doing so. (*Plaintiff's Memorandum*, at 17-18). He does, however, allude to such a contention in his Local Rule 56.1(b)(3)(B) statement of facts, in which he claims that he attempted to prove his termination was discriminatory before the Harvey Civil Service Commission, but was thwarted. (*Pl.St.*, ¶ 46)[Dkt # 82]. The defendants' Response

to this statement of fact is that "it misstates the evidence and the cited evidence [Tab 13, Civil Service testimony Doc. 479] does not support the proposition asserted." [Dkt #88 at 20].

While it is true that *res judicata* does not apply "if the plaintiff did not have a full and fair opportunity to litigate his claim in state court," *Hicks v. Midwest Transit, Inc*., 479 F.3d 468, 471 (7th Cir. 2007); *Arlin-Golf, LLC v. Village of Arlington Heights*, 631 F.3d 818, 823 (7th Cir. 2011), there is no admissible evidence that Mr. Gbur was prevented from presenting his discrimination and retaliation claims. His conclusory statement in ¶ 46 that he was prevented from making the case by the chief attorney and the Civil Service Commission is not evidence. And the defendants are correct in saying that the testimony from the administrative hearing on which Mr. Gbur relies does not support his claim that he was obstructed in presenting a claim for discriminatory termination. Here is the testimony cited in Mr. Gbur's Statement of Material Facts:

> MR. WEINER: No further questions.
> I move to strike all of the offer of proof.
>
> MR. VITIRITTI: Sustained.
>
> MR. BLASS: No further questions.
>
> MR. WEINER: No further questions.
>
> MR. VITIRITTI: Mr. Soderlund, you're excused.
>
> MR. BLASS: Can I have a moment to get a glass of water?
>
> MR. CHAIRMAN: You may.
> (a short break was had. )
>
> MR. BLASS: May I approach?
>
> MR, VITIRITTI: You may.
>
> (WHEREUPON, a sidebar was had outside the hearing of the court reporter.)

29

MR. BLASS: Mr. Chairman, I'd like to proceed by reading into the record awards and certificates received by my client, Officer Gbur.

MR. WEINER: No objection.

MR. BLASS: This is a certificate of discharge from the United States Marine Corps, dated 24 April

(*Pl.St.*, ¶ 46 (Tab 13, Civil Service testimony Doc. 479).

The cited exchange lends no support to Mr. Gbur unless the "offer of proof" that the chief attorney successfully moved to strike contained evidence supporting a claim of discrimination. The problem is that neither Mr. Gbur's Statement of Material Fact nor his brief refers either to the content of the offer of proof or to any specific action that "prevented" his attempt to raise or prove his discrimination claim. Hence, there is nothing to support the claim that *res judicata* should not apply. *See Arlin-Golf*, 631 F.3d at 823 ("the plaintiffs fail to point out any relevant authority . . . indicating that the circumstances . . . denied them a full and fair opportunity to litigate their claims, and we find none. Accordingly, any argument that this exception applies is meritless or waived.").[11]

It ought to be noted that neither on review of the City of Harvey Civil Service Commission's decision upholding Mr. Gbur's firing nor in the appeal from the Circuit Court's adverse decision against him in the Illinois Appellate Court did Mr. Gbur make any claim of error based on having been prevented from advancing a discrimination claim or involving the striking of the offer of proof. *See* Exs. Circuit Court Order and Appellate Court Order to ¶51 of defendants' Rule 56.1 Statement. In the Illinois Appellate Court, Mr. Gbur raised three issues: 1) the decision to terminate him was

---

[11] Moreover, the "prevent[ion]" argument belongs in a brief, not in a conclusory assertion in a statement of facts. It ought to have been developed and supported by citations to relevant case authority. Undeveloped and unsupported arguments are deemed waived. *MMG Financial Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 659 (7th Cir. 2011); *Long-Gang Lin v. Holder*, 630 F.3d 536, 543 (7th Cir. 2010).

against the manifest weight of the evidence; 2) defendants' decision to terminate his employment was excessive and unduly harsh; and 3) even if the determination to fire him was otherwise proper, the defendants should have considered a lesser discipline because another officer, who committed certain infractions, was promoted thus resulting in inconsistent disciplinary actions. There was no claim that the disparity in treatment was racially based. The Illinois Appellate Court rejected Mr. Gbur's arguments, concluding, *inter alia*, that his explanations for his conduct were incredible, and that his situation did "not even bear a modicum of similarity to that involving" the "promoted officer." (Appellate Court Order at 9-10, 16-17).

This leaves the question of whether Mr. Gbur's claims in the state court proceedings constitute the same cause of action as his current federal claims. Illinois employs a transactional test to determine whether this requirement is met. Separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief. *Arlin-Golf*, 631 F.3d at 821; *River Park, Inc. v. City of Highland Park,* 184 Ill.2d 290, 703 N.E.2d 883, 893 (1998). This holds true even if there is not a substantial overlap of evidence, as long as they arise from the same transaction. *Arlin-Golf*, 631 F.3d at 821; *River Park,* 703 N.E.2d at 893. The addition of new theories of relief in a subsequent suit arising from the same operative facts satisfies the second requirement for applying res judicata. *Arlin-Golf*, 631 F.3d at 822; *see also Brzostowski v. Laidlaw Waste Systems, Inc.,* 49 F.3d 337, 339 (7th Cir. 1995)("Two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations."); *Smith v. City of Chicago,* 820 F.2d 916, 918 (7th Cir.1987) (although "one group of facts may give rise to different claims for relief upon different

31

theories of recovery, there remains a single cause of action. . . . Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost.").

The defendants rely on *Garcia* to demonstrate that the transactional test is met here. In that case, the plaintiff was a Mount Prospect police officer who was denied duty-related disability benefits by the Mount Prospect police pension board. 360 F.3d at 632-33. The plaintiff sought administrative review in the Circuit Court of Cook County, arguing that the board's decision was against the manifest weight of the evidence. The court upheld the board's decision, and the plaintiff filed a federal lawsuit alleging that the board's decision was motivated by discrimination based on national origin and race and retaliation under Title VII, §1981, and §1983. 360 F.3d at 633-34.

Even though the plaintiff had not mentioned discrimination or retaliation in his state court proceeding, the Seventh Circuit determined that both the plaintiff's appeal of the board's denial of his disability application and his federal claims all arose from the same core of operative facts:

> it is true that [plaintiff's] administrative appeal of the Board's decision looked only at whether the denial was against the manifest weight of the evidence, . . . and arbitrary and capricious – a very narrow review of the decision's propriety. And [plaintiff's] complaint in federal district court alleges that the Board's decision was improper because it was the product of illegal discrimination and retaliation, for which he should be compensated through an award of full duty-related disability benefits and damages. But regardless of what a court reviews the Board's decision for, both the administrative appeal and the instant lawsuit question the basis – either proper or improper – of the Board's denial of [plaintiff's] disability benefits. The "core of operative facts" is identical for both causes of action: the acts of the Board and the Village Police Department leading up to and including the Board's decision to deny the benefits. Attempts to construe the causes of action in any other manner are futile.

*Id.* at 637-38.

Similarly, here, the state court reviewed the Civil Service Board's determination that Mr. Gbur should be terminated for rules violations under a manifest weight of the evidence standard, and

Mr. Gbur, like the plaintiff in *Garcia*, brought discrimination and retaliation charges – also under Title VII and §1983 – in federal district court, but didn't raise such concerns in the administrative proceeding or in state court. But, as in *Garcia*, the core of operative facts is the same: the acts of Harvey's police department that led up to Mr. Gbur's termination.

Mr. Gbur doesn't see it that way. He says that in *Garcia*, the core of operative facts was limited to the pension board's decision to deny benefits, whereas his problem is limited to the racial discrimination on the parts of Mayor Kellogg and Chief Joshua. He says what the commission did is of no concern to him and was not motivated by racism or retaliation. (*Plaintiff's Memorandum*, at 17-18). That may be so, but that distinction doesn't really differentiate the situation here from that in *Garcia*. There, the court held, in the above-cited passage, that the claims clearly included the police department's conduct in the core of operative facts – not just the pension board's decision. And, in any event, the procedural niceties of a benefits denial and a termination are different. While the Plaintiff in *Garcia* applied directly to the pension board without going through the ranks of the police department first, the termination here necessitated some lead up from the police department: Chief Joshua filing charges with the Civil Service Commission. The point to be taken from *Garcia* is that a police officer who challenges a detrimental employment decision on a manifest evidence basis and later claims that decision stemmed from discriminatory motives is dealing with the same core of operative facts for *res judicata* purposes.

*Pirela v. Village of North Aurora*, 935 F.2d 909 (7th Cir. 1991) is even closer to this case than *Garcia*. There, a police chief charged a Puerto Rican police officer with rules violations; a board reviewed the charges, and the officer was terminated. He challenged the decision as being against the manifest weight of the evidence, and filed a federal discrimination lawsuit as well. The plaintiff

believed that he was being discriminated against when he was passed over for two promotions and suspended without pay for various infractions of police department rules. Before he could file with the EEOC, the police chief brought further rules violation charges against him with the village's board of fire and police commissioners. Following a hearing, the board found the plaintiff guilty of four of five charged violations and discharged him. 935 F.2d at 910.

The plaintiff filed a complaint for administrative review of the board's decision in the Circuit Court for Kane County, Illinois. There, he argued only that the decision was against the manifest weight of the evidence, and presented no evidence that his employment was terminated as the result of racial or national origin discrimination. The circuit court concluded that the board's findings were not against the manifest weight of the evidence and affirmed the board's decision discharging plaintiff. *Id.* at 910.

While the state court proceedings were pending, the plaintiff filed a formal charge of discrimination with the EEOC. He later amended his EEOC charge to include an allegation of discriminatory discharge. After receiving a right-to-sue letter, he filed a three-count complaint in federal district court alleging discrimination on the basis of race in the village's promotion, salary, suspension, and discharge procedures pursuant to Title VII, and discrimination on the basis of national origin in the village's promotion, salary, suspension, and discharge procedures pursuant to 42 U.S.C. § 1981. The village argued that the Title VII and §1981 claims were precluded by *res judicata*, and the district court agreed and dismissed the case. 935 F.2d at 910-11.

On appeal, the Seventh Circuit agreed that the plaintiff's termination and suspension claims were precluded:

> Both of [plaintiff's] claims arose out of the same operative facts: [plaintiff's] misconduct and the NAPD's procedures relating to suspension and termination.

34

Because his Title VII and § 1981 claims in this litigation, as well as the possible defense he had in the state proceedings, concern this single procedural scenario, [plaintiff's] action is barred by the transactional approach.

*Id.* at 912.

So viewed, there are no subtle differences of the type that Mr. Gbur sees in regard to *Garcia* (i.e., the decision of a pension board versus a termination set in motion by a police department and confirmed by a civil service board). *Res judicata* applied in *Pirela,* and it does so here as well. Mr. Gbur's state-court challenge to the termination decision and the his federal court suit "concern [a] single procedural scenario." Accordingly, that portion of Mr. Gbur's complaint dealing with his termination and the allegedly discriminatory investigation and suspension leading up to it must be dismissed.

That leaves Mr. Gbur's Title VII claims relating to hostile work environment under and the rehiring of terminated African-American officers under Title VII, and his First Amendment retaliation claims regarding unsafe equipment assignments, threats of termination, denial of vacation days, unsafe work assignments, and not being invited to union meetings with the mayor.

## C.
### Mr. Gbur Has Failed To Exhaust Administrative Remedies Regarding His Hostile Work Environment And Rehiring Of Terminated African-American Officers Claims

The defendants also submit that Mr. Gbur failed to exhaust his administrative remedies in regard to his hostile work environment claim and his claim about the rehiring of African-American police officers who had been discharged for disciplinary reasons.[12] Generally, a plaintiff may not

---

[12] The allegation in Count I that the individual defendants rehired African-American police officers because of their race would not appear to be a stand alone claim for relief, but simply a specification of the various ways in which Mayor Kellogg and Chief Joshua allegedly "discriminate[d] against white officers." (*Second Amended Complaint*, ¶ 21(b)). Mr. Gbur's second amended complaint mentions that this was a

(continued...)

bring claims under Title VII that were not originally included in the EEOC charges. *Moore v. Vital Products, Inc.*, 641 F.3d 253, 256 (7th Cir. 2011); *Sitar v. Ind. Dep't of Transp.,* 344 F.3d 720, 726 (7th Cir. 2003).[13] But a Title VII suit need not be a mirror image of EEOC charges; it may include claims that are "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Insurance., Inc.,* 538 F.2d 164, 167 (7th Cir.1976). To be "like or reasonably related," the relevant claim and the EEOC charge "'must, at minimum, describe the same conduct and implicate the same individuals.'" *Moore*, 641 F.3d at 257.

In his first EEOC charge, Mr. Gbur said: "(1) I have been employed as a police officer by the City of Harvey from 10 Sept 2001 to the present. I am a white male. (2) Starting in about 2003, the City of Harvey implemented a practice of filling vacant supervisory positions in its police department

with African American and Hispanic persons. (3) I am qualified to be promoted to sergeant but I have not been able to apply for that promotion because of the above referred employment practice. (*Def.St.*, ¶ 31; Gbur Dep.; Ex. 2). His second EEOC charge reads: "(1) I was employed as a police officer by the City of Harvey from 10 September, 2001 until 21, 2001. I am a white male. (2) I was

---

[12](...continued)
practice, but does not connect it to anything that happened to him. That is, Mr. Gbur does not allege that he was not rehired because he was white even though African-American officers were rehired. In other words, it is not alleged that Mr. Gbur was discriminated against because *he* was not rehired. Of course, the fact that the practice may not be charged as a claim does not mean that it does not have evidentiary value. It clearly does. See Rule 404(b), Federal Rules of Evidence.

[13] The defendants mistakenly argue that this is a jurisdictional requirement. (*Defendants' Memorandum*, at 2). It is not, *see Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982); *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 921 (7th Cir. 2007); *Teal v. Potter*, 559 F.3d 687, 691 (7th Cir. 2009); *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994), and the cases on which the defendants rely are quite outdated.

suspended without pay on October 26, 2006 for alleged misconduct and subsequently discharted [sic] for the same alleged misconduct.  (3) During the same period, the City of Harvey continued to pay at least two African-American police officers who had engaged in very serious misconduct and has refused to fire several African-American police officers who have engaged in very serious serious [sic] misconduct.  (4) I was suspended without pay and discharged because of my race (white)." (Gbur Dep. Ex. 3).

Mr. Gbur argues that "[t]here is no question" that the charges describe the same conduct and implicate the same individuals as his current federal court complaint. (*Plaintiff's Memorandum*, at 15).  But Mr. Gbur cannot rely on the fact that there were a number of generally discriminatory actions.  "Any additional alleged act of discrimination can always be fit in and become part of an overall general pattern of discrimination. [Mr. Gbur's] argument, if accepted, would eviscerate the general rule that each separate act of discrimination must be set out in an EEOC charge before an action can be brought."  *Jones v. Res-Care, Inc.*, 613 F.3d 665, 670 (7th Cir. 2010).  The fact is, the EEOC charge and the complaint *don't* describe the same conduct.  "Because an employer may discriminate [on the basis or race] in numerous ways, a claim of [race] discrimination in an EEOC charge and a claim of [race] discrimination in a complaint are not alike or reasonably related just because they both assert forms of [race] discrimination."  *Cheek v. Western and Southern Life Insurance. Co.*, 31 F.3d 497, 501 (7th Cir. 1994)(considering sex discrimination charges).  Similarly, Mr. Gbur's hostile work environment and rehiring federal claims and his discriminatory discharge, promotion, and disciplinary EEOC claims may be directed at forms of race discrimination or retaliation, but that does not  make them alike or reasonably related.

In *Moore*, the plaintiff's EEOC charge focused almost entirely on evidence of a sexually and racially hostile work environment, involving inappropriate racial and sexual language, racial and sexual insults, and inappropriate sexual behavior. It also mentioned retaliatory work assignments. It made no mention of a racially or sexually motivated discharge. Nonetheless, the plaintiff raised that claim in his federal suit. The Seventh Circuit held that, "[a]t best, the EEOC charge can be read to allege a hostile work environment and retaliation (though not retaliatory discharge). These harassment and retaliation allegations are not like or reasonably related to [plaintiff's] discriminatory discharge claims because they are not based on the same conduct." *Moore*, 641 F.3d at 257.

So, too, here. Mr. Gbur's discriminatory rehiring and hostile work environment claims are not based on the same conduct as his charges that he was denied promotions and received worse disciplinary treatment – suspension and discharge – than African-American officers. *See also Swearnigen-El v. Cook County Sheriff's Dept.*, 602 F.3d 852, 864-65 (7th Cir. 2010)(charge of discrimination on the basis of race and sex not reasonably related to claim of retaliation for speaking out against discriminatory conduct); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009)(charge of discriminatory discipline for certain infractions not related to similar claim in connection with later infractions); *Miller v. American Airlines, Inc.*, 525 F.3d 520, 526 (7th Cir. 2008)(claim that policy is facially discriminatory not related to charge that policy was applied in a disparate manner); *Geldon v. South Milwaukee School Dist.*, 414 F.3d 817, 820 (7th Cir. 2005)(charge of discrimination in selection for "assistant painter/relief custodian position" not related to claim of discrimination in selection for "substitute custodian position"); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir.1992)(racial discharge and of denial of promotion claim were not reasonably related to denial of benefits, harassment, and adoption of racially

discriminatory policy claims).

*Jenkins v. Blue Cross Mut. Hosp. Insurance., Inc.*, 538 F.2d 164, 169 (7th Cir. 1976) and *Harper v. Godfrey Co.*, 45 F.3d 143, 148 (7th Cir. 1995), on which Mr. Gbur relies, do not counsel a different result. In *Jenkins*, the court allowed a sexual discrimination claim where the plaintiff failed to check the sexual discrimination box in her EEOC charge, but alluded to instances of sexual discrimination in the body of her charge. *Id.* at 169. Here, the body of Mr. Gbur's EEOC charges – "the particulars" – do not so much as hint at a hostile work environment or discriminatory rehiring claim. *Harper* is even less apt. There the court refused to find claims of discrimination in regard to a seniority list related to a charge of discriminatory layoffs. 45 F.3d at 148. Accordingly, it must be concluded that Mr. Gbur has not exhausted his administrative remedies as to his claims of a hostile work environment and discriminatory rehiring practices – even if the latter is construed as a separate claim.

## D.
## Racial Discrimination Under Title VII

The defendants next argue that Mr. Gbur cannot establish that there is a disputed issue of material fact regarding his claim for suspension and subsequent firing. As discussed earlier, this claim is precluded by *res judicata*. *See supra* at 27. But assuming for the sake of discussion it is not, the defendants' contention will be addressed. A plaintiff alleging racial discrimination under Title VII can prove his case under either the direct or indirect method. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010); *Weber v. Univ. Research Ass'n, Inc.*, 621 F.3d 589,

592 (7th Cir.2010). Here, Mr. Gbur focuses exclusively on the indirect, or burden-shifting method. (*Plaintiff's Memorandum of Law*, at 2-7).[14]

Under that approach, to survive summary judgment, Mr. Gbur must introduce evidence to establish: (1) that he was a member of a protected class, (2) that he was performing his job satisfactorily, (3) that he suffered an adverse employment action, and (4) that defendants treated a similarly situated individual outside his protected class more favorably. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010); *Dear v. Shinseki,* 578 F.3d 605, 609 (7th Cir. 2009). If Mr. Gbur satisfies those elements, thus giving rise to an inference of discrimination, the burden would shift to defendants to identify a legitimate, nondiscriminatory reason for the action taken. *Montgomery*, 626 F.3d at 394; *Stockwell v. City of Harvey,* 597 F.3d 895, 901 (7th Cir. 2010). If the defendants are able to do that, summary judgment would only be erroneous if Mr. Gbur produced

---

[14] The choice/difference between the direct method and indirect or burden-shifting method seems to be a source of confusion. *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). The direct method does not require *direct* evidence, but allows for a plaintiff to demonstrates that he "was a member of a protected class and *as a result* suffered the adverse employment action of which he complains." *Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008)(quotations omitted, emphasis original). The court has explained that circumstantial evidence demonstrating intentional discrimination includes:

"(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination.

*Id.*, at 672. *See also Silverman v. Board of Education, .* In other words, at least in the case of examples (2) and (3), the same type of evidence as would be part of a burden-shifting case. But as Mr. Gbur does not bring up the direct method in his response to the defendants' motion for summary judgment, these aspects of the case law need not be addressed.

evidence that the proffered reason was a pretext for racial discrimination. *Montgomery*, 626 F.3d at 394; *Stockwell,* 597 F.3d at 901.

The defendants argue that Mr. Gbur cannot show he is a member of a protected class, that he was performing his job satisfactorily, or that other, similarly situated non-white officers were treated more favorably. Even if Mr. Gbur could succeed on these elements of his *prima facie* case, the defendants submit that they had a legitimate, non-discriminatory reason for suspending and then firing him.

## 1.

## There Is A Genuine Issue As To Whether Mr. Gbur Is A Member Of A Protected Class

For white plaintiffs to bring race discrimination claims, the Seventh Circuit requires evidence of "background circumstances' that demonstrate that a particular employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). The court traces this burden to the Supreme Court's establishment of the indirect, burden-shifting method in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 804 (1973), where it required a plaintiff to show "that he belongs to a racial minority." 411 U.S. at 804. The Court did not define "racial minority" – the plaintiff there was African-American – but in Harvey, Illinois, 12% of the population is white, while 73% is African-American. http://www.clrsearch.com/Harvey_Demographics/ IL/Population-by-Race-and-Ethnicity. The mayor is African-American, as is the chief of police. Of the city's 55 police officers (in 2007), just 8 were white, while 42 were African-American. (*Pl.St.*, ¶ 11; *Defendant. Rsp.*, ¶ 11). So there is a significant statistical disparity and the race with the numerical

superiority also has the power. By a commonsense definition, Mr. Gbur, as a white man, is a racial minority in this milieu.

That this situation would suffice for the Seventh Circuit is not only a matter of common sense – which has a perfectly legitimate role to play in discrimination or any other kind of case, *Peirick v. Indiana University-Perdue University Indianapolis Athletics Dept.*, 510 F.3d 681, 689 (7th Cir. 2007); *Elkhatib v. Dunkin Donuts*, 493 F.3d 827 (7th Cir. 2007) – it is clear from *Hague v. Thompson Distribution Co.*, 436 F.3d 816, 822 (7th Cir. 2006). There, the court considered a group of white plaintiffs who were suing their African-American boss for firing them and replacing them with African-American employees. The court noted that "[t]ypical discrimination cases often see members of a racial minority challenging their non-minority employer's decision to fire them and hire white replacements. Analogously, here we have an African-American employer terminating white employees and hiring African-American replacement workers. These circumstances create the same inference of discrimination flowing from the more straightforward discrimination cases." 436 F.3d at 822. That's the dynamic that's at work here as well.

In addition, there is evidence here of racial epithets by someone in power – a police chief – which the court has indicated "might" be sufficient to establish the requisite background circumstances. *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1119 (7th Cir. 2009). Moreover, the mayor of the city admittedly made it a practice to hire back African-American police officers – with immediate promotions – who had been terminated for disciplinary reasons. He testified without elaboration that it was his opinion that the suspensions were racially motivated, a feeling he could only draw from his experience as alderman. He could point to no facts of the specific firings to justify his conclusions and thus his conduct.

The sum of all this is "fishy" enough for Mr. Gbur to stave off summary judgment. Moreover, the defendants' brief, for whatever reason, list three white police officers, who held the rank of commander until 2003 – when Mr. Kellogg was elected mayor – and "reverted" to the rank of sergeant thereafter. (*Memorandum*, at 11). It's not clear what this is supposed to prove; the wording suggests that these individuals suffered demotions to sergeant from the higher rank of commander due to their race. Perhaps that's a mistaken impression, but the defendants don't explain the police department hierarchy or why being "reverted" is a good thing. In any case, summary judgment is inappropriate on the issue of whether Mr. Gbur is a member of a protected class.

## 2.
## Satisfactory Job Performance

Next, Mr. Gbur must provide evidence that he was meeting his employer's legitimate expectations. He has – to an extent. At his deposition, Chief Joshua testified as follows:

> Q: Prior to you bringing allegations of misconduct against Mr. Gbur, were there – with respect to his squad car, was [sic] there any other job deficiencies that you had made note of while he was under your command?
> A: No.

(Joshua Dep., at 65). There were, as Mr. Gbur's record demonstrates, a few instances where he was written up after Chief Joshua took over. He failed to meet minimum work standards in October 2004. (*Def.St.*, ¶ 23; Gbur Dep., at 39; Ex. 1). He failed to report to an assignment in January 2005. (*Def.St.*, ¶ 24; Gbur Dep., at 40; Ex. 1). He failed to show up for court appearances on December

8, 2004, and January 12, 2005. (*Def.St.*, ¶ 25; Gbur Dep., at 44; Ex. 1; Kellogg Dep., at 44).[15] But, apparently, Chief Joshua does not consider these instances to amount to "job deficiencies."

But, these incidents all preceded, by at least two years, Mr. Gbur's termination. The episode with the squad car and the fire hydrant was apparently another matter. In that instance, Chief Joshua brought termination charges. The Seventh Circuit has explained that, when considering whether an employee is meeting an employer's legitimate expectations, the question is whether he was performing adequately at the time of the adverse employment action. *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009). Mr. Gbur offers no evidence to suggest that his conduct in connection with this incident met his employer's legitimate expectations. Moreover, he does not even address it in his brief in the context of this portion of his *prima facie* case. (*Plaintiff's Memorandum*, at 4-5).

There is, however, an "out" for Mr. Gbur. "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate expectations in a disparate manner ... the second and fourth prongs merge—allowing plaintiffs to stave off summary judgment for the time being, and proceed to the pretext inquiry." *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 831 (7th Cir.2007); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010). It's not an argument that Mr. Gbur extensively amplifies on, (*Plaintiff's Memorandum*, at 4-5), but is alleged in the Second Amended Complaint. *See* ¶ 21(c). Of course, the allegation is not proof, but Mr. Gbur does support that contention with sufficient evidence demonstrating that difference in discipline. *See Montgomery*, 626 F.3d at 394.

**3.**

---

[15] The defendants also assert that Mr. Gbur was cited for productivity problems on two occasions, but fail to indicate when these occurred. (*Def. St.*, ¶ 33).

**Similarly Situated Non-White Officers Were Treated More Favorably**

The next element in Mr. Gbur's *prima facie* case requires him to demonstrate that non-white officers who were similarly situated were treated more favorably than he. In determining whether someone is comparable for this purpose, the relevant factors include whether the employee in question: (1) held the same position or had the same description; (2) was subject to the same standards; (3) was subordinate to the same supervisor; and (4) had comparable experience, education, and other qualifications. *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 742 (7th Cir. 2011); *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 2009); *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). *See generally Paulcheck v. Union Pacific Railroad Co.*, 2010 WL 1727856, 3 (N.D.Ill. 2010); *Sommerfield v. City of Chicago*, 613 F.Supp.2d 1004, 1015 (N.D.Ill. 2009).

Mr. Gbur cites five examples to stave off summary judgment on this aspect of his case: Mike Neal, Mike Hartwell, Hollis Dorough, Richard Jones, and Manuel Escalante. (*Plaintiff's Memorandum*, at 5-7). But he focuses almost exclusively on the disciplinary records of these policemen and pays insufficient attention to the other pertinent factors. Mr. Hartwell and Mr. Dorough were not similarly situated because they were detectives, not patrol officers like Mr. Gbur. (*Def.St.*, ¶ 56; *Pl.Rsp.*, ¶ 56). Mr. Gbur asserts that "detective" is not a rank, but an assignment. (*Plaintiff's Memorandum*, at 6). It may not technically constitute a "rank," but it is a different job title with higher pay than a patrol officer. (*Pl.St.*, Ex. 9, at 249). Hence, the question becomes whether a patrol officer and a detective have comparable responsibilities. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008)(employees differed where they had different positions and different responsibilities).

45

Mr. Gbur's own brief suggests they do not: he indicates the two positions are different assignments, and he cites a page in the Harvey police manual[16] that lists job descriptions in the department and does not include "detective;" but that is not evidence that he had the same responsibilities as Mr. Hartwell and Mr. Dorough. Mr. Gbur did testify that "detectives are basically the same as patrol officers as far as – per the contract, the union contract" (*Pl.St.*, ¶ 1; Gbur Dep., at 43), but he said nothing about the responsibilities of the two "assignments" or even that the responsibilities were the same. Mr. Gbur's evidence on this point is insufficient. *See Ford v. Minteq Shapes and Services, Inc*., 587 F.3d 845, 848 (7th Cir. 2009)("The record's only evidence of [defendant] paying more to white employees with equal responsibilities is [plaintiff's] own conclusory, uncorroborated testimony. This is not enough to survive summary judgment."); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007)(plaintiff demonstrated that individuals with different job title were similarly situated by presenting evidence that they did the same work, with same output, on the same shift).[17]

---

[16] Mr. Gbur has not properly authenticated several of the documents he relies upon, including the police manual and the CBA. Thus, even if they supported his factual assertions, they would not be admissible as evidence in this summary judgment proceeding. *Article II Gun Shop, Inc. v. Gonzales,* 441 F.3d 492, 496 (7th Cir.2006); *Scott v. Edinburg,* 346 F.3d 752, 760 n. 7 (7th Cir.2003); *Woods v. City of Chicago,* 234 F.3d 979, 988 (7th Cir.2001).

[17] Mr. Gbur advances two comparators – Mr. Escalante and Mr. Jones – that he did not mention in his interrogatory responses, so the defendants were unable to address their circumstances in their opening brief. Mr. Gbur's own evidence shows that Mr. Escalante was a detective and a sergeant during at the time of his discipline, which puts him in the category with Mr. Hartwell and Mr. Dorough. Mr. Jones was a patrol officer who, among other things, damaged a squad car by driving over a pothole and a piece of concrete. (*Pl.St.*, ¶ 27; Ex. 18, at 1441). He didn't report the incident when he returned to the station. He explained that he was attempting to drive closer to two suspects he observed. His sergeant found this explanation"unacceptable" because he was required to operate his vehicle in a safe manner and cited him for failing to report an accident immediately. (*Pl.St.*, ¶ 27; Ex. 18, at 1441). Unlike Mr. Gbur, Mr. Jones did not lie about what happened, or change his story about what happened later on. And the lying was the significant factor in Mr. Gbur's termination. *See supra*, at 44-45. So Mr. Jones is not similarly situated because his infraction was different. *See Antonetti v. Abbott Laboratories,* 563 F.3d 587 (7th Cir. 2009)(employees who
(continued...)

Mike Neal is another matter, however. He was a patrol officer – like Mr. Gbur – from 2003 to 2004. His infraction during that time was speeding through red lights and down sides streets, and sleeping on duty when he reported performing a premises check. In other words, he filed a false report. (*Def. St.*, ¶ 62; *Pl.Rsp.*, ¶ 62). He reported to a different sergeant than those involved in Mr. Gbur's disciplinary proceedings; but that sergeant – Sergeant Soderlund, who was white – actually filed a report recommending he be terminated. (*Def. St.*, ¶ 62; *Pl.Rsp.*, ¶ 62). Sergeant Soderlund cited him for nine rules violations: rules of conduct, violation of rules, unbecoming conduct, neglect of duty, incompetence, obedience to orders, submission of reports, use of emergency warning devices, use of in-car video recorder. (*Pl.St.*; Ex. 18, at 592). Nothing came of it; in fact, Mr. Neal was promoted to the mayor's body guard detail. The mayor was apparently unperturbed by Mr. Neal's driving because the former patrol officer's duties included taking the mayor to and from meetings. (Kellogg Dep., at 39).

Three of the violations Mr. Neal was charged with – unbecoming conduct, incompetence, and submission of reports – match up with the charges that led to Mr. Gbur's termination. For the defendants, however, that's insufficient to make Mr. Neal similarly situated, because he and Mr. Gbur did not report to the same supervisor and didn't commit the same infractions. The fact that the two didn't report to the same supervisor is inconsequential here, because Mr. Neal's supervisor didn't look the other way because Mr. Neal was African-American. His recommendation for termination fell on deaf ears further up the line at the point – apparently the Chief Joshua point (*Def.St.*, ¶ 62) – where Mr. Gbur's termination went through.

---

[17](...continued)
admitted lying about an event are not comparable to those who did not and who received harsher discipline).

Similarly situated employees need not be identical in all respects. It is enough that they are comparable in those respects which are material. *See Patterson v. Indiana Newspapers, Inc.,* 589 F.3d 357, 365–66 (7th Cir. 2009). Beyond race, there appears no reasonable or obvious explanation for the failure to discipline Mr. Neal wasn't disciplined given the serious nature of his violations. Chief Joshua testified that he "couldn't answer" as to why he didn't follow through with discipline against Mr. Neal; he "just [didn't] know." (*Def.St.*, ¶ 62, Joshua Dep., at 58). As far as matching, violation for violation, the charges against Mr. Neal and Mr. Gbur, the defendants cut things a bit too finely.

The requirement that comparators be "similarly situated," obviously does not and could not require complete congruence in all details. It is enough that the plaintiff employee need not be 'identical,'" and in regard to comparable conduct, "the plaintiff must show that the other employee 'had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him].'" *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 592 (7th Cir. 2008). *See also Antonetti,* 563 F.3d 587 (employees who lied about an event are not comparable to those who told the truth).

The similarly situated inquiry is a "flexible, common-sense one." *Henry v. Jones,* 507 F.3d 558, 564 (7th Cir. 2007). For example, in *Peirick v. Indiana University-Purdue University Indianapolis Athletics Dept.*, 510 F.3d 681, 691 (7th Cir. 2007), a collegiate athletics coach, was fired for using abusive language, unsafe driving, leaving students behind during a road trip, and pitting the students against the administration during a scheduling conflict. She was held to be similarly situated to two male coaches who were merely reprimanded for failing to treat students with respect, and being verbally abusive and allowing students to drink alcohol on a road trip. 510 F.3d at 691.

48

Here, perhaps the main thing that distinguishes Mr. Gbur's conduct from Mr. Neal's – and this is an argument that the defendants don't make – is the fact that he damaged his squad car. But this factor was not terribly troubling to the commission deciding his fate:

> This is not about a police officer who accidentally damaged his vehicle. If that had been the case, and [Mr. Gbur] had admitted to his supervisors that he accidentally hit the fire hydrant, arguably there might have been a different conclusion reached by this Commission in terms of discipline.

(Notice of Discharge, at 11, ¶ (uu)). Mr. Neal was also taken to task for lying about his activities:

> Officer Neal submitted his daily activity sheet, premise check sheet, and park check sheet claiming he performed 68 premises checks of the local businesses and parks, however his video shows that each and every premise check that he claims he performed was fictitious and in fact he never conducted any premise or park checks.

(*Pl.St.*, Ex. 18, at 592). So lying and submitting false reports were the key elements of both Mr. Neal's and Mr. Gbur's infractions. While a jury may determine that the degree of similarity here is insufficient, *LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010)("Whether a comparator is similarly situated is usually a question for the fact-finder."), there is enough similarity to make summary judgment on Mr. Gbur's *prima facie* case inappropriate.

## 4.

### The Defendant's Proffered Reason For Mr. Gbur's Termination Is Insufficient To Conclude That There Is Not A Disputed Issue Of Fact On The Question Of Pretext

The defendants spend only a paragraph on the question of whether the reason for Mr. Gbur's termination was legitimate and non-discriminatory or pretextual, merely referring to their argument regarding the more favorable treatment of similarly situated, non-white officers. (*Defendants' Memorandum*, at 14). The Seventh Circuit has acknowledged that the *prima facie* and pretext

49

analyses often overlap, and that courts can proceed directly to the pretext inquiry if the defendant offer a nondiscriminatory reason for its action. *Radentz v. Marion County*, 640 F.3d 754, 757 (7th Cir. 2011); *Adelman–Reyes v. Saint Xavier University,* 500 F.3d 662, 665 (7th Cir. 2007). An employer's justification for a termination may be considered pretextual where the plaintiff demonstrates that it had no basis in fact, it did not actually motivate the decision to terminate employment, or it was insufficient to motivate that decision. *Radentz*, 640 F.3d at 757; *Davis v. Wisconsin Dept. of Corrections,* 445 F.3d 971, 977 (7th Cir.2006); *Davis v. Con–Way Transp. Cent. Express, Inc.,* 368 F.3d 776, 784 (7th Cir. 2004). Here, given the record, there is at least an issue of fact as to whether Mr. Gbur's infractions actually motivated his termination.

As already discussed, at least one non-white officer who committed some of the same infractions as Mr. Gbur, including the most significant infractions – lying and making a false report – was actually promoted rather than disciplined. The chief of police had no explanation for this seemingly significant disparity in treatment. Thus, it is at least a question of fact for the jury as to whether something else – like race – was the motivating factor in Mr. Gabor's firing. In *Boumehdi*, the employer cited a negative performance review as the reason for denying the plaintiff a raise. But the court held that a jury could have determined that the review itself was discriminatory – retaliation for complaining about discrimination – and that it "[could] not reverse course and say that the review constitute[d] a legitimate reason for denying [plaintiff] a raise." 489 F.3d at 792-793. Along these lines, in *Radentz*, the employee's reason for replacing white coroners with African-American coroners was expense of certain autopsies under the plaintiffs' contracts. But there was evidence that a new supervisor was interested in replacing white workers with African-American workers, tending to demonstrate that the proffered reason was pretextual. 640 F.3d at 759. Here,

the evidence tends to suggest that the Harvey police department was more lenient with non-white officers than with Mr. Gbur. That is enough to require denial of summary judgment.

The result of all this is that claims for race discrimination under Count I in violation of Title VII are barred by the doctrine of *res judicata*, even though the motion for summary judgment is denied.

## E.
### The Retaliation Claims Under §1983 in Count II For Mr. Gbur's Alleged Exercise of His First Amendment Rights[18]

In order to establish a prima facie case of unlawful First Amendment retaliation, a public employee must establish that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and (3) his speech was a motivating factor in his employer's adverse action. *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 670 (7th Cir. 2009); *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). If a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech. *Valentino*, 575 F.3d at 670; *Massey*, 457 F.3d at 717. If the employer carries this burden, the plaintiff may still avoid summary judgment by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising his First Amendment rights. *Valentino*, 575 F.3d at 670;

---

[18] The defendants contend that those parts of Counts I and II that allege that the investigation, suspension, and termination of Mr. Gbur was discriminatory or retaliatory are barred by the doctrine of *res judicata*. (*Defs. Motion to Dismiss* at ¶3).

*Massey*, 457 F.3d at 717. The Seventh Circuit has indicated that the term "retaliation" might be misleading, as infringement on First Amendment rights occurs both when employers deter future speech as well as when they punish past speech. *Kodish*, 604 F.3d 490, 501 (7th Cir. 2010).[19]

The claimed protected speech in this case is: (1) Mr. Gbur's testimony during the Department of Justice investigation in April 2006; (2) his EEOC charge in May 2006; and (3) his supporting a rival candidate during Mayor Kellogg's 2007 re-election campaign. (*Plaintiff's Memorandum*, at 8). The defendants argue that Mr. Gbur has no cognizable First Amendment retaliation claim because he cannot establish that the defendants were aware of any protected activity (and thus could not have been retaliating against him because of it) and Mr. Gbur did not suffer a "materially adverse action." (*Defendants' Memorandum*, at 15-16).

Defendants' assert, without proof, that they had no idea that Mr. Gbur gave testimony during the DOJ investigation, meaning Mr. Gbur cannot show that but for his protected speech, the defendants would not have taken the same actions. *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010); *Salas v. Wisconsin Dept. of Corrections*, 493 F.3d 913, 925 (7th Cir. 2007). Mr. Gbur counters with evidence that an attorney for the city was present throughout his interview. (*Pl.St.*, ¶ 35; Ex. 6, Alexis Decl.). He also points out that when asked to admit whether the attorney informed the city and the police department of the interview, the defendants objected on the grounds that their admission would reveal privileged information and work product. (*Pl.St.*, ¶ 35; Ex. 1, ¶ 6).

---

[19] The court also mused that the burden-shifting method may not be suited to these cases in the wake of *Gross* v. *FBL Fin.Serv., Inc.*, – U.S. --, 129 S.Ct. 2343 (2009). *Kodish*, 604 F.3d at 501.

Of course, that contention was baseless. Simply admitting that a communication was made is not a disclosure of what was communicated to the client. In other words, it would not reveal privileged advice or an attorney's work product. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 388 (7th Cir. 2008)("Communications from attorney to client are privileged only if they constitute legal advice, or tend directly or indirectly to reveal the substance of a client confidence . . . ."); *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 768 (7th Cir. 2006)(work product doctrine designed to protect party's research and strategy); *Itex, Inc. v. Workrite Uniform Co. Inc.*, 2011 WL 1224920, *2 (N.D.Ill. 2011)(" . . . .neither answer, admit or deny," would divulge privileged information).

Significantly, the defendants do not deny that they were aware of Mr. Gbur's DOJ testimony. Nor do they deny that they were aware of the content of his testimony. That silence is telling. *Compare United States v. Vrdolyak*, 593 F.3d 676, 691 (7th Cir. 2010)("Where the district court has stated such an alternative basis, we should treat the appellant's silence as at least a forfeiture of the issue. And it is hard to believe that the government's approach to this appeal was not carefully considered in every respect. We would be justified in finding a waiver based on the government's failure to address the alternative calculation and its failure to challenge the reasonableness of the sentence."); *Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008) (Posner, J)("[I]f there is an executed standstill agreement, one would expect an allegation to that effect. There is none. The complaint's silence is deafening.").

One need not rest on inferences from silence, however. It is a reasonable inference that the lawyer who attended the DOJ interview on behalf of the City faithfully fulfilled his ethical obligations and reported to his employer what occurred. Indeed, it is unreasonable to suggest the

contrary. After all, what was the point of sending him in the first place if he was not to report on what occurred.

We come then to the question of the defendants' knowledge of Mr. Gbur's EEOC charge of May 8, 2006. Responding to Mr. Gbur's interrogatories, the defendants admitted that the City of Harvey became aware of the charge "two days after May 18, 2006." (*Pl.St.*, ¶ 36, Ex. 2, ¶ 9). Mr. Gbur makes no argument regarding whether the city's knowledge gives the mayor knowledge as well. Chief Joshua said at his deposition that May 20, 2006 "sound [sic] about right." (*Pl.St.*, ¶ 36; Ex. 22, at 39). But when asked whether he felt Chief Joshua retaliated against him for the EEOC charge, he initially said he couldn't say for sure, but then said that he did not, and he could not name anything specific that Chief Joshua did to him. (*Def.St.*, ¶ 32; Gbur Dep., at 151).

While Mr. Gbur later filed an affidavit claiming that Chief Joshua retaliated against him by using racial slurs, allowing him to be assigned to an unsafe vehicle, and terminating him (*Pl.Rsp.*, ¶ 32; Ex. 2, ¶ 9), it is well-settled that a party cannot create an issue of fact to avoid summary judgment by contradicting his deposition testimony with an affidavit. *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007); *Ineichen v. Ameritech,* 410 F.3d 956, 963 (7th Cir. 2005).[20]

That leaves his support for the mayor's rival. Here, Mr. Gbur relies on the testimony of Mr. Harris, the union representative, who claimed to have heard the mayor say that Mr. Gbur was "backing Marion Beck anyway." (*Pl.St.*, ¶39; Ex. 23; Harris Dep., at 20-21). Mr. Harris also

---

[20] The defendants argue that a fair portion of Mr. Gbur's affidavit is made up of conclusory assertions that he was discriminated against or retaliated against, and that some of his statements are inadmissible hearsay.

testified that the mayor said his administrators would "take care of" Mr. Gbur for filing a grievance about the squad car assignment. (*Pl.St.*, ¶ 39; Harris Dep., at 21). While Mr. Gbur does not argue that filing the grievance was one of his protected activities (*Plaintiff's Memorandum*, at 8), the evidence is relevant and admissible under Rule 404(b), Federal Rules of Evidence. In short, Mr. Harris' testimony is sufficient to warrant denial of the motion for summary judgment.

Next the defendants argue that, aside from his termination, Mr. Gbur cannot show he has suffered a "materially adverse action" as a result of his protected activities. The threats of termination, denial of vacation time, assignment to the unsafe squad car, and not being invited to union meetings, according to defendants, do not qualify. (*Defendants' Memorandum*, at 16). The only time Mr. Gbur has identified when he was denied vacation days was in March 2005. (*Pl.Rsp.*, ¶ 21; Gbur Dep., at 81). Since that was before any of his protected activity, it can play no role in his First Amendment claim. Moreover, it is not clear that the union meeting was an actual union meeting to which Mr. Gbur ought to have been invited. The meeting was between the mayor and police union leaders regarding "some problems that many of the officers were having with his administration." (Harris Dep., at 14). Mr. Gbur does not submit that he was a union leader, and there is no evidence that other members of the rank and file attended. In other words, there is no evidence that this alleged "deprivation" was a deprivation at all.

The squad car assignment is the remaining point. As the defendants see it, this wasn't a big deal because it lasted just one shift. (*Defendants' Memorandum*, at 16). But the evidence suggests the car was potentially dangerous, especially for police work, and there were a number of newer, better, and safer cars available. (*Def.St.*, ¶ 34). Moreover, Mr. Gbur testified that when he asked why he was be assigned such a car, his sergeant told him it was a punishment. (*Pl.St.*, ¶ 44; Gbur

Dep., at 75). Especially given that context, it cannot be said that there is no issue that this action was not the type that would deter Mr. Gbur from engaging in protected activity in the future. The claim advanced by Mr. Gbur does not require repeated wrongdoing. Whatever vitality the old maxim that a dog is entitled to one bite has in current tort law, it has none in the context of the violation alleged in this case.

## F.
## The *Monell* Claim

Finally, the defendants argue that Mr. Gbur cannot maintain a *Monell* claim because there is no evidence of an express policy or widespread practice of retaliation in violation of First Amendment rights. (*Defendants' Memorandum*, at 18). Mr. Gbur's response consists of his assert[ion] that Chief Joshua and Mayor are policymakers in the City of Harvey" and "were intimately involved in police discipline." He does not mention this in connection with any *Monell* claim argument, but in connection with his attempt to establish a *prima facie* case of retaliation. (*Plaintiff's Memorandum*, at 10). Indeed, nowhere in his brief does Mr. Gbur even mention *Monell*, or cite any case law pertaining to a *Monell* claim, such as *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009) (plaintiff can maintain a *Monell* claim when he can show he suffered a constitutional deprivation at the hands of an individual with policy-making authority). Accordingly, any argument Mr. Gbur might have made to advance this claim is deemed waived. *See Clarett v.* Roberts, 657 F.3d 644, 674 (7th Cir. 2011); *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); United *States v. Johnson*, 643 F.3d 545 (7th Cir. 2011).

## CONCLUSION

The defendants' *Rooker Feldman* motion is denied. The defendants' motion based upon *res judicata* is granted as applied to Mr. Gbur's claims for race discrimination and unlawful investigation, suspension and firing. The motion is also granted as to claims of a hostile work environment and discriminatory rehiring of non-white police officers – assuming that the latter is a viable claim under the facts of this case – for failure to exhaust administrative remedies. The defendants' motion for summary judgment on all claims is denied. The defendants' motion regarding the *Monell* claim is granted for the reasons stated in the opinion. *See supra* at 56. The case is set for further status on January 4, 2012 at 8:30 a.m.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 12/19/11